SA:ICR
F.# 2014R01644

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -

FRANTZ JANVIER,
MACHEL SCARLETT,
TRACEY MELLISA SANDY,
GREGUY JANVIER,
JAMILA MALIKA ALLEN and
MELBOURNE BLACK,

         Defendants.

- - - - - - - - - - - - - - - - - - - - - X

15-777 M

TO BE FILED UNDER SEAL

AFFIDAVIT AND
COMPLAINT IN SUPPORT
OF AN APPLICATION
FOR ARREST WARRANTS

(T. 18, U.S.C., §§ 371,
 1956(a)(1)(B)(i))

EASTERN DISTRICT OF NEW YORK, SS:

       KAYVAN KAZEMI, being duly sworn, deposes and states that he is a Postal Inspector with the United States Postal Inspection Service, duly appointed according to law and acting as such.

       Upon information and belief, in or about and between February 2009 and October 2014, both dates being approximate and inclusive, within the Eastern District of New York, the defendants FRANTZ JANVIER, MACHEL SCARLETT, and TRACEY MELLISA SANDY, together with others, did knowingly and intentionally conspire to steal, take and abstract from an authorized depository for mail matter, to wit: Terminal One at John F. Kennedy International Airport in Queens, New York, one or more letters or packages and articles contained therein, contrary to Title 18, United States Code, Section 1708.

       (Title 18, United States Code, Section 371).

Upon information and belief, in or about and between June 2011 and December 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants FRANTZ JANVIER, GREGUY JANVIER, JAMILA MALIKA ALLEN, and MELBOURNE BLACK, together with others, did knowingly and intentionally conduct one or more financial transactions in and affecting interstate and foreign commerce, to wit: the exchange of foreign currency for United States currency, and the deposit, withdrawal and transfer of funds, which in fact involved the proceeds of specified unlawful activity, to wit: mail theft, in violation of Title 18, United States Code, Section 1708, knowing that the property involved in such financial transactions represented the proceeds of some form of unlawful activity, and knowing that such transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activity.

(Title 18, United States Code, Section 1956(a)(1)(B)(i)).

The source of your deponent's information and the grounds for his belief are as follows: [1]

1.  I am a Postal Inspector with the United States Postal Inspection Service. I am familiar with the facts contained in this affidavit as a result of my participation in the investigation, my review of the investigative file and reports, and my discussions with law enforcement personnel and other persons involved in the investigation.

---

[1] Because this affidavit is submitted for the limited purpose of establishing probable cause for arrest warrants, I have not set forth each and every fact learned during the course of the investigation. Statements attributable to individuals herein are set forth in sum and substance and in part, unless otherwise indicated.

I.  BACKGROUND OF THE INVESTIGATION

   A.  Cargo Handlers and Mail at JFK Airport

   2.  United States Mail is routinely carried on international commercial passenger flights that arrive at and depart from John F. Kennedy International Airport ("JFK Airport") in Queens, New York, including, as relevant here, Japan Airlines ("JAL") flights that arrive at and depart from JFK Airport's Terminal One.  Letter mail is typically carried in the cargo compartments of the aircraft in large air cargo containers, also referred to as "cans," or in smaller standardized International Post Corporation containers called "IPC trays" or "mail trays."

   3.  When aircraft carrying U.S. Mail arrive at JFK Airport's Terminal One, the mail in their cargo compartments is unloaded by "ramp agents," also referred to as cargo handlers, who are employed by a company contracted to provide services to the airlines that operate out of Terminal One.  The same cargo handlers also load outbound U.S. Mail on flights departing from Terminal One.  At all times relevant to this Complaint, the cargo handlers who unloaded and loaded aircraft operating out of Terminal One were employed by Aviation Service International Group ("ASIG").

   4.  The cargo handlers who unload and load the large aircraft that operate out of Terminal One typically work in teams to unload cargo from the airplane's forward, aft, and bulk cargo compartments simultaneously. Cargo handlers use a specialized machine called an FMC Cargo Loader ("FMC Loader") to unload cans from the forward and aft cargo compartments, and a mobile conveyor belt called a "belt loader" to unload bulk cargo from the bulk cargo compartment in the rear of the airplane.  The bulk cargo compartment is typically separated from the aft cargo compartment by a net that can be moved aside by

3

cargo handlers to move between the compartments.  While some cargo handlers work inside the cargo compartments of the airplane to prepare cans and bulk cargo to be removed from the plane on the FMC Loader and belt loader, others work outside handling the cargo that is removed from the airplane.  The same process, but in reverse, is used to load cargo onto the airplane.

   B. <u>Cooperating Witness #1 and the Conspiracy to Steal Mail</u>

   5. Beginning in or about April 2014, postal inspectors learned that U.S. Mail was being stolen from flights whose cargo was transported through Terminal One.  The investigation revealed that cargo handlers employed by ASIG were entering the cargo compartments of aircraft known to carry U.S. Mail and opening cans and IPC trays while inside the aircraft to search for letter mail containing currency.

   6. In or about September 2014, postal inspectors conducting surveillance of ASIG cargo handlers at Terminal One observed two cargo handlers spending unusually long periods of time inside the cargo compartments of an airplane and taking turns going inside the airplane.  This practice was contrary to what I understand, based on my training and experience, to be the standard operating procedure for loading and unloading mail onto aircraft.  Postal inspectors approached the two cargo handlers, and one of them (hereinafter identified as "CW1") admitted that he/she had been stealing letter mail with the second cargo handler and that they had been taking turns "looking out" while the other stole mail inside the airplane.[2]  Thereafter, CW1 agreed to cooperate with postal inspectors and to provide

---

[2] On or about March 13, 2015, CW1 pleaded guilty in the United States District Court for the Eastern District of New York pursuant to a cooperation agreement with the government.  CW1 is cooperating in the hopes of obtaining leniency at sentencing.  CW1's information has been reliable thus far and has been corroborated.

4

information on the activities of ASIG cargo handlers who were stealing mail from aircraft operating out of Terminal One.

7. CW1 has explained that he/she and other cargo handlers working in Terminal One targeted letter mail because senders of letter mail sometimes enclose currency in their letters and because stolen letters can be concealed in clothing more easily than bulky parcel mail. CW1 has observed cargo handlers grabbing handfuls of letter mail and concealing it in the lining of their jackets, under their shirts, and in their pockets. CW1 has further explained that cargo handlers steal mail inside an airplane's cargo compartments where they cannot be seen by those outside the airplane, while other cargo handlers outside the airplane act as look-outs for others who might walk by the open door to the airplane's cargo compartments and see the cargo handlers stealing mail inside the airplane. When cargo handlers inside the airplane finish stealing and concealing mail, CW1 has explained that they typically switch places with the cargo handlers working in different parts of the airplane or acting as look-outs outside the airplane to allow them an opportunity to steal mail.

8. CW1 has explained that because JFK Airport's Terminal One is used for international flights, the currency contained in letter mail carried on flights that arrive at Terminal One from foreign countries is typically foreign currency. Based on my investigation and my review of JFK Airport records, I know that at all times relevant to this Complaint, at least one JAL flight arrived at Terminal One of JFK Airport every day. Based on my review of records and the investigation of this case, I know that FRANTZ JANVIER, MACHEL SCARLETT, TRACEY MELLISA SANDY, and CW1 were each employed by ASIG as cargo handlers at Terminal One at JFK Airport during overlapping periods of time during the time period relevant to this Complaint. I also know that ASIG cargo handlers at

5

Terminal One, including CW1 and the defendants FRANTZ JANVIER, SCARLETT, and SANDY, were assigned on various days during the time period relevant to this Complaint to unload the JAL flights that arrived at JFK Airport.

9.      According to CW1, ASIG cargo handlers at Terminal One shared a locker room and a break room where they would discuss, among other things, stealing mail. In conversation amongst themselves, cargo handlers referred to stealing mail as "eating." Cargo handlers would indicate their intent to steal mail to other cargo handlers in various ways, including by stating that they were "hungry" and that they needed to "eat," and, referring to aircraft on arrival to JFK Airport's Terminal One, by stating something to effect that "there is food in the belly of the plane."

10.     CW1 has observed the defendants FRANTZ JANVIER, SCARLETT, and SANDY, among other cargo handlers, stealing letter mail from airplanes.

11.     CW1 also advised that when he/she stole letter mail containing foreign currency he/she converted the stolen foreign currency to United States Dollars ("Dollars") at foreign currency exchange businesses located at JFK Airport or through his/her personal bank account. Based on my review of records, I know that at all times relevant to this Complaint, Travelex Currency Services Inc. ("Travelex") operated several retail foreign currency exchange kiosks in terminals throughout JFK Airport, including in Terminals Two, Three, Four, Five, Seven, and Eight. Additionally, at all times relevant to this Complaint, ICE Currency Exchange USA, the U.S. subsidiary of Lenlyn Ltd. ("ICE") operated a retail foreign currency exchange kiosk in Terminal One at JFK Airport.

12.     Based on my investigation and my review of records, I know that Travelex and ICE have adopted policies and procedures requiring their employees to collect

information from their customers in connection with certain foreign exchange transactions. This information can include information necessary to verify the identity of the customer, and can also include information on the source and origin of the currency the customer is seeking to exchange. However, Travelex did not typically collect customer identifying information for low value transactions. Based on my review of records provided by Travelex and my conversations with Travelex employees, I know that during the time period relevant to this Complaint, Travelex ordinarily required its employees to obtain customer identifying information only if the value of an individual foreign exchange transaction exceeded $1,000.

13. As discussed below, I have reviewed records from Travelex, ICE, and from several other financial institutions that provide foreign exchange services, which indicate that between in or about February 2009 and in or about September 2014, the defendants FRANTZ JANVIER, TRACEY MELLISA SANDY, GREGUY JANVIER, JAMILA MALIKA ALLEN, and MELBOURNE BLACK personally exchanged and caused others to exchange foreign currency for an aggregate amount of approximately $225,000. Based on my investigation and review of records, and as further described below, I estimate that the loss attributable to the mail theft conspiracy described in this Complaint is likely to exceed $250,000.

II. THE DEFENDANTS

14. Additional detail regarding each defendant's involvement is set forth below:

A. The Defendant FRANTZ JANVIER

15. On or about October 9, 2014, CW1, who was then working as a cargo handler at Terminal One of JFK Airport, advised postal inspectors that he/she had just

observed FRANTZ JANVIER take a large amount of mail from inside of his uniform and put it inside of his locker during his shift.  As a result, postal inspectors then went to the employee parking lot and waited for FRANTZ JANVIER to arrive at his vehicle.  There postal inspectors observed FRANTZ JANVIER arrive at his vehicle and attempt to hide a black plastic bag under a vehicle as they approached.  Postal inspectors recovered the black plastic bag which was found to contain approximately 25 pieces of letter mail addressed to recipients in the United States from senders in Japan, and one piece of letter mail addressed to a recipient in Singapore from a sender in the United States.  Postal inspectors identified themselves to FRANTZ JANVIER as law enforcement officers and he voluntarily agreed to go back to their offices and speak with them.

               16.    After being advised of his <u>Miranda</u> rights, FRANTZ JANVIER agreed to be interviewed.  FRANTZ JANVIER stated that he had been stealing mail from the aircraft he unloaded at Terminal One since early 2012.  He admitted that he searched the mail for letters that he thought would contain currency, and on the JAL flights the currency in such letters was typically Yen.  He further stated that he stole mail with other cargo handlers and that they "looked out" for one another while they stole mail.  FRANTZ JANVIER also admitted that the black plastic bag that he had hidden under the vehicle contained mail that he had stolen from a JAL flight.

               17.    As indicated above, CW1 has advised postal inspectors that he/she has observed FRANTZ JANVIER and SANDY steal mail together on multiple occasions, including from JAL flights.  For example, CW1 stated that in or about 2013 he/she watched FRANTZ JANVIER and SANDY work together to sift letter mail in the cargo compartment of an airplane to identify letters likely to contain currency.

18. FRANTZ JANVIER explained that after stealing foreign currency from the mail, he would exchange it for Dollars at a variety of locations including at the Travelex and ICE foreign exchange kiosks at JFK Airport and through his Citibank account. FRANTZ JANVIER stated that employees at JFK Airport's foreign exchange kiosks eventually began to ask him questions about how he had obtained Yen and in some cases refused to exchange foreign currency with him. In order to avoid suspicions about the origin of the currency, FRANTZ JANVIER stated that he asked other persons to exchange Yen for him in exchange for a portion of the proceeds of the transactions.

19. Although FRANTZ JANVIER claimed that he had begun stealing foreign currency from the mail in 2012, I know from records of foreign currency exchanges conducted by FRANTZ JANVIER that FRANTZ JANVIER regularly exchanged foreign currency beginning as early as February 2009. Records obtained from multiple financial institutions, including Travelex and ICE, indicate that FRANTZ JANVIER personally exchanged foreign currency for an aggregate total of at least $82,000 between in or about February 2009 and in or about July 2013.

B.  The Defendant MACHEL SCARLETT

20. Based on my investigation and review of records, I know that MACHEL SCARLETT was employed by ASIG as a cargo handler at Terminal One during the same time period that FRANTZ JANVIER, TRACEY MELLISA SANDY, and CW1 were employed as cargo handlers at Terminal One by ASIG. As discussed above, CW1 has advised postal inspectors that he/she has stolen mail with SCARLETT on several occasions, and that they would alternate roles stealing mail and looking out for one another.

21. On or about February 18, 2015, postal inspectors approached SCARLETT and identified themselves as law enforcement. After being advised of his <u>Miranda</u> rights, SCARLETT agreed to be interviewed. Among other things, SCARLETT stated that he had stolen mail with other cargo handlers and that they looked out for one another while they stole mail. SCARLETT admitted that he had been stealing mail since 2010. SCARLETT also surrendered to postal inspectors a large quantity of foreign currency that he admitted to having stolen from the mail, including Yen.

    C.    <u>The Defendant TRACEY MELLISA SANDY</u>

22. Based on my investigation and review of records, I know that TRACEY MELLISA SANDY was employed by ASIG as a cargo handler at Terminal One from approximately late 2008 through January 2015, during the same time period that FRANTZ JANVIER, SCARLETT, and CW1 were employed as cargo handlers at Terminal One by ASIG. As discussed above, CW1 has advised postal inspectors that he/she has observed FRANTZ JANVIER and SANDY steal mail together on multiple occasions, including from JAL flights, and that he/she has observed them work together to sift letter mail in the cargo compartment of an airplane to identify letters likely to contain currency.

23. Based on my review of foreign exchange transaction records maintained by Travelex, ICE, and other financial institutions, I know that SANDY also exchanged foreign currency for an approximate aggregate amount of at least $4,750, between in or about December 2009 and in or about April 2014.

24. On or about February 18, 2015, postal inspectors approached SANDY and identified themselves as law enforcement. After being advised of her <u>Miranda</u> rights, SANDY agreed to be interviewed. SANDY confirmed that she worked as a cargo handler

for ASIG at Terminal One from 2008 to 2015 with, among others, FRANTZ JANVIER and SCARLETT. SANDY further stated that she was responsible for loading and unloading mail from two of the three JAL flights that fly through JFK Airport daily. SANDY stated that she had heard about mail theft and had seen mail being stolen, but she denied that she had ever stolen mail, exchanged foreign currency, or deposited foreign currency into her bank account. When SANDY was shown records indicating that foreign currency had been exchanged through her bank account, she denied any knowledge of those transactions and stated, in sum and substance, that if postal inspectors were going to arrest her they should arrest her.

        D.      <u>The Defendant GREGUY JANVIER</u>

        25.      Based on my investigation and review of records, I know that GREGUY JANVIER is FRANTZ JANVIER's older brother and worked at JFK Airport as a security guard from approximately 2011 through May 2014, during the time that FRANTZ JANVIER worked as a cargo handler at Terminal One. One of GREGUY JANVIER's assignments was to provide security services at Terminal One of JFK Airport. Because of his job, GREGUY JANVIER had an employee identification card that granted him unrestricted access to each of the terminals in JFK Airport. I have reviewed financial records indicating that FRANTZ JANVIER and GREGUY JANVIER both used the same mailing address in Brooklyn, New York during the time period relevant to this Complaint. I have also reviewed records from Travelex, ICE, and other financial institutions indicating that GREGUY JANVIER personally exchanged foreign currency, primarily Yen, for an aggregate total of at least $90,000 between approximately June 2011 and July 2014.

26. Foreign exchange transaction records maintained by Travelex document behavior that, based on my training and experience, indicates that GREGUY JANVIER used multiple, repeated proximate foreign exchange transactions as part of a conscious effort to conceal the nature and source of the proceeds of mail theft. For example, on July 21, 2012, at approximately 7:09 p.m. GREGUY JANVIER exchanged 150,000 Yen for $1,689.30 at a Travelex kiosk in the Departures area of Terminal Four at JFK Airport. At approximately 7:41 p.m. on the same date, GREGUY JANVIER exchanged 180,000 Yen for $2,027.16 at a Travelex kiosk in the Arrivals area of Terminal Eight at JFK Airport. At approximately 8:04 p.m. on the same date, GREGUY JANVIER exchanged 150,000 Yen for $1,689.30 at a Travelex kiosk in the Arrivals area of Terminal Seven at JFK Airport. GREGUY JANVIER provided the same name, date of birth, driver's license, address, and Social Security Number in connection with each of the three foreign exchange transactions he conducted with Travelex on July 21, 2012. The exchange rate that Travelex applied to each of the three transactions that GREGUY JANVIER conducted with Travelex on July 21, 2012, was the same and, as such, based on my training and experience, there was no legitimate economic reason for GREGUY JANVIER to carry out three nearly identical transactions to sell Yen to Travelex for the same exchange rate at three different Travelex kiosks at JFK Airport.

27. In another example of this behavior, Travelex's transaction records reflect that on November 10, 2012, at approximately 1:22 p.m. GREGUY JANVIER exchanged 250,000 Yen for $2,790.64 at a Travelex kiosk in the Departures area of Terminal Four at JFK Airport. At approximately 1:46 p.m. on the same date, GREGUY JANVIER exchanged 250,000 Yen for $2,790.64 at a Travelex kiosk in the Arrivals area of Terminal

Seven at JFK Airport. At approximately 2:10 p.m. on the same date, GREGUY JANVIER exchanged 250,000 Yen for $2,790.64 at a Travelex kiosk in the Arrivals area of Terminal Eight at JFK Airport. GREGUY JANVIER provided the same name, date of birth, driver's license, address, and Social Security Number in connection with each of the three foreign exchange transactions he conducted with Travelex on November 10, 2012, that he had provided in connection with the three foreign exchange transactions he conducted with Travelex on July 21, 2012. The exchange rates that Travelex applied to each of the three transactions that GREGUY JANVIER conducted with Travelex on November 10, 2012, were the same, and, as such, based on my training and experience, there was no legitimate economic reason for GREGUY JANVIER to carry out three identical transactions to sell Yen to Travelex for the same exchange rate at three different Travelex kiosks at JFK Airport.

28. I have also reviewed foreign exchange transaction records from Travelex and ICE that, based on my training and experience, indicate that FRANTZ JANVIER and GREGUY JANVIER worked together to exchange foreign currency as part of a coordinated effort to conceal the nature and source of the proceeds of mail theft. For example, on October 8, 2012, at approximately 1:23 p.m. GREGUY JANVIER exchanged 300,000 Yen for $3,328.75 at an ICE kiosk in Terminal One of JFK Airport. At approximately 1:57 p.m. on the same date, FRANTZ JANVIER exchanged 300,000 Yen for $3,382.04 at a Travelex kiosk in the Arrivals area of Terminal Seven at JFK Airport. At approximately 2:02 p.m. on the same date, GREGUY JANVIER exchanged 300,000 Yen for $3,382.04 at a Travelex kiosk in the Arrivals area of Terminal Eight at JFK Airport.

29. I have also reviewed internal reports of high value transactions and suspicious activity documented by employees of the currency exchange company ICE. In

one report in or about February 2013, for example, an employee of ICE noted that GREGUY JANVIER gave suspicious and inconsistent answers to questions regarding the origin of the large amounts of Yen he was regularly exchanging for Dollars at the ICE kiosk in Terminal One of JFK Airport. The same ICE employee noted in a later report in or around April 2013, that after GREGUY JANVIER was again asked about the origins of the Yen, he offered a "tip" to the employee in Dollars. According to the report, the employee declined the tip. Approximately one month later, ICE transaction records indicate that GREGUY JANVIER stopped conducting high value exchanges of Yen for Dollars at the ICE kiosk in Terminal One. Based on my training and experience, I believe that GREGUY JANVIER's offer to "tip" the ICE employee was an attempt to bribe the employee to cease questioning him about the source of the Yen.

30. On or about December 9, 2014, postal inspectors approached GREGUY JANVIER and identified themselves as law enforcement. After being advised of his Miranda rights, GREGUY JANVIER agreed to be interviewed. GREGUY JANVIER stated that he worked at JFK Airport as a security guard from approximately 2011 until approximately May 2014 and that he had exchanged Yen for his brother FRANTZ JANVIER at the Travelex and ICE foreign exchange kiosks at JFK Airport and through his TD Bank account for approximately two years. GREGUY JANVIER further stated that when employees of the foreign exchange kiosks at JFK Airport asked him where he obtained the Yen, he lied to them, telling them a different story every time. GREGUY JANVIER claimed that he had been told that the Yen was obtained from Japanese tourists. GREGUY JANVIER admitted, however, that he knew something was wrong when he observed his brother FRANTZ JANVIER in possession of approximately one million Yen. GREGUY

14

JANVIER admitted that he had been compensated for his efforts through a payment of a portion of the proceeds of the transactions, and that he had not disclosed this as income on his income tax returns.

### E. The Defendant JAMILA MALIKA ALLEN

31. Based on my investigation and review of records, I know that JAMILA MALIKA ALLEN became FRANTZ JANVIER's girlfriend in 2011, during the time that FRANTZ JANVIER worked as a cargo handler at Terminal One. In the course of my investigation I visited ALLEN's home in Brooklyn, New York, in December 2014 where I observed that she was living with FRANTZ JANVIER. I have also reviewed records from Travelex, ICE, and other financial institutions indicating that ALLEN personally exchanged foreign currency, primarily Yen, for an aggregate total of at least $34,000 between approximately October 2012 and September 2014.

32. Foreign exchange transaction records maintained by Travelex and ICE document behavior that, based on my training and experience, indicates that ALLEN used foreign exchange transactions as part of a conscious effort to conceal the nature and source of the proceeds of mail theft. For example, on June 25, 2013, at approximately 7:47 p.m. ALLEN exchanged 500,000 Yen for $4,448.55 at the ICE kiosk in Terminal One of JFK Airport. At approximately 8:45 p.m. on the same date, Allen exchanged 500,000 Yen for $4,536.43 at a Travelex kiosk in the Arrivals area of Terminal Seven at JFK Airport. ALLEN provided the same name, date of birth, state identification card, address, and Social Security Number in connection with the foreign exchange transactions she conducted with ICE and Travelex on June 25, 2013.

33. Foreign exchange transaction records maintained by Travelex also document behavior that, based on my training and experience, indicates that FRANTZ JANVIER and ALLEN worked together to exchange foreign currency as part of a coordinated effort to conceal the nature and source of the proceeds of mail theft. For example, on July 20, 2013, at approximately 1:53 p.m. ALLEN exchanged 500,000 Yen for $4,406.76 at a Travelex kiosk in the Arrivals area of Terminal Four at JFK Airport. At approximately 2:32 p.m. on the same date, ALLEN exchanged 500,000 Yen for $4,448.41 at a Travelex kiosk in the Arrivals area of Terminal Eight at JFK Airport. At approximately 5:17 p.m. on the same date, FRANTZ JANVIER exchanged 550,000 Yen for $4,847.44 at a Travelex kiosk in the Arrivals area of Terminal Seven at JFK Airport.

34. On or about December 16, 2014, postal inspectors went to ALLEN's home in Brooklyn, New York. When they arrived, postal inspectors found both FRANTZ JANVIER and ALLEN at the residence and observed that FRANTZ JANVIER appeared to be living with ALLEN. Postal inspectors identified themselves as law enforcement, and after being advised of her <u>Miranda</u> rights, ALLEN agreed to be interviewed. ALLEN stated that FRANTZ JANVIER had given her Yen to exchange for Dollars, that she had exchanged Yen at foreign exchange kiosks at JFK Airport and through her bank accounts "a maximum" of twenty times, and that she would usually be given $500 after each exchange. ALLEN further stated that she assumed that the Yen she had been given had been stolen.

F.   The Defendant MELBOURNE BLACK

35. Based on my investigation I know that MELBOURNE BLACK was employed by ASIG as a cargo handler at JFK Airport's Terminal One at all times relevant to this Complaint and worked with CW1 and the defendants FRANTZ JANVIER, SCARLETT,

16

and SANDY. I have reviewed records from Travelex and ICE indicating that BLACK personally exchanged foreign currency on multiple occasions, including in 2009, and on April 20, 2013, when he exchanged 155,000 Yen for $1,355.05 at the ICE kiosk in Terminal One. A high value transaction report prepared by the ICE employee who executed the April 20, 2013 transaction included a note indicating that BLACK was a customer who exchanged mostly small denominations of Yen at the ICE kiosk in Terminal One on a weekly basis.

36. On or about December 17, 2014, and January 21, 2015, postal inspectors approached MELBOURNE BLACK, who was employed as a cargo handler at JFK Airport, and identified themselves as law enforcement. BLACK was advised of his Miranda rights and agreed to be interviewed by law enforcement on both occasions. BLACK stated that another ASIG cargo handler who worked at Terminal One with BLACK had asked BLACK to exchange foreign currency for him/her, including Yen, at various currency exchange kiosks at JFK Airport. BLACK further stated that this cargo handler had paid BLACK to exchange currency for him/her after the cargo handler's shift had ended approximately 10 to 15 times because the cargo handler was still wearing his/her uniform at the end of his/her shift. BLACK also stated that this cargo handler had paid BLACK to drive the cargo handler from Terminal One to foreign exchange kiosks in other terminals of JFK Airport approximately 10 to 15 times. BLACK stated that this cargo handler had told him that the foreign currency had been stolen from the mail.

G. The Loss Attributable to the Mail Theft

37. I have reviewed records obtained from Travelex, ICE, and from several other financial institutions that provide foreign exchange services, which indicate that between in or about February 2009 and in or about September 2014, the defendants

17

personally exchanged and caused others to exchange foreign currency for an aggregate amount of approximately $225,000.

38. Based on my investigation and review of records, I know that foreign exchange service providers like Travelex and ICE earn revenue by, among other things, setting the exchange rate that is used to determine the amount of currency that the customer will receive in the transaction and/or by charging explicit commissions or fees on a transaction-by-transaction basis. Because these transaction costs are reflected in and reduce the amount of currency that a customer receives in a foreign exchange transaction, the amount of currency that a customer receives typically understates the pre-conversion value of the foreign currency that the customer exchanged. For example, I have reviewed records provided by ICE which indicate that ICE recorded an aggregate "profit" of $5,522.05 on foreign exchange transactions in which the defendants FRANTZ JANVIER, GREGUY JANVIER, JAMILA MALIKA ALLEN, and MELBOURNE BLACK received, in aggregate, $39,098.85, reflecting an average transaction cost of approximately 12% of the value of the currency exchanged. Accordingly, I estimate that the loss attributable to the mail theft conspiracy described in this Complaint is likely to exceed $250,000, including both the amount of Dollars obtained from foreign currency exchanges as well as the transaction costs incurred in the exchanges.

WHEREFORE, your deponent respectfully requests that arrest warrants be issued so that the defendants FRANTZ JANVIER, MACHEL SCARLETT, TRACEY MELLISA SANDY, GREGUY JANVIER, JAMILA MALIKA ALLEN, and MELBOURNE BLACK may be dealt with according to law.

IT IS FURTHER REQUESTED that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including this Complaint and any resulting arrest warrants. Based upon my training and experience, I have learned that criminals actively search for criminal affidavits via the Internet, and disseminate them to other criminals as they deem appropriate, e.g., by posting them publicly through online forums. Therefore, premature disclosure of the contents of this Complaint and related documents will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, and notify confederates.

Dated: Brooklyn, New York
      August 17, 2015

                                      S/ Kayvan Kazemi

                                      _____
                                      KAYVAN KAZEMI
                                      Postal Inspector
                                      United States Postal Inspection Service

Sworn to before me this
17th day of August, 2015

  S/ Viktor Pohorelsky
_____
THE HONORABLE VIKTOR V. POHORELSKY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK